IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

FILED
FEB 19 2002
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| BEAR MGC CUTLERY CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: CV-00-PT-3591-E |
| | ) | |
| ESTES EXPRESS LINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION [1]

FINDINGS OF FACT AND CONCLUSIONS OF LAW

ENTERED
FEB 19 2002

This cause came on to be heard on January 22, 2002 at a bench trial.

FINDINGS OF FACTS

Basic Facts

Bear MGC Cutlery Company, Inc. ("Bear") is an Alabama corporation doing business in Jacksonville, Alabama. Estes Express Lines, Inc. ("Estes") is a foreign corporation doing business in Alabama. Estes operates a transportation truck line for the shipment of goods.

In February 1999 Bear contracted with Estes to ship specialty knives and displays. The displays and specialty knives were initially shipped from Jacksonville, Alabama, to Atlanta, Georgia. Bear supplied and packed the containers in which the knives were stored. After a trade show in Atlanta, Georgia, the knives and displays were shipped back to Jacksonville, Alabama. Estes received eight items in Atlanta.[2] Estes delivered eight items as evidenced on the delivery

---

[1] On November 14, 2000, plaintiff Bear MGC Cutlery ("Bear") filed this civil action in the Circuit Court of Calhoun County, Alabama. On December 14, 2000, defendant Estes Express Lines ("Estes") removed the action to this court. See opinion with regard to motion to remand.

[2] There was no evidence of any problem with regard to the shipment from Jacksonville to Atlanta. There is no document in evidence which indicates that Estes noted any damage to the shipped crates when received from an intermediary in Atlanta.

60

receipt. A representative of Bear signed the delivery receipt noting that the property was received in good condition except as otherwise noted.

After this February shipment, Bear continued to utilize Estes' services. The contract between the parties consisted of the bills of lading and freight bills as well as Estes' tariff which is published as required by the Interstate Commerce Act, 49 U.S.C. § 13710(a)(1), and is incorporated by reference in the bills of lading. During all contracts between the parties, Estes' Tariff EXLA 105-D was in effect. Tariff 105-D includes Item 720.[3] From September 1999 until March 2000, Bear entered into numerous contracts for interstate shipments and received services from Estes in the form of shipping and transportation of goods, products, and merchandise. In consideration for these shipments, Bear agreed to pay Estes' freight charges. Estes billed Bear the costs of the shipments that occurred between September of 1999 and March of 2000. Estes never received payment from Bear for these services.

Estes followed the steps outlined in Tariff 105-D to revoke Bear's discount and to assess a collection fee. Prior to Estes invoking Tariff 105-D, Bear owed Estes $7,120.56 for discounted

---

[3] Item 720 reads as follows:

All shipments upon which the lawfully applicable rates and charges are not paid in full within a thirty (30) calendar day period from date of invoice will be subject to the following late payment provisions:
1. The carrier will provide the debtor with written notification that the freight bill is past the thirty (30) day credit period.
2. The debtor of delinquent freight bills will accrue the following later payment penalty on each delinquent freight bill:
    (a). A late payment penalty fee will be applied to each delinquent freight bill, as follows: LATE PENALTY FEE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.0%
    (b). The debtor will have up to fifteen (15) calendar days, from the date of notification, to present payment in full.
    (c). Non-payment after this time period, will result in the debtor forfeiting all discounts shown on each freight bill.
3. If carrier elects to proceed with legal action or place delinquent charges with an outside collection agency, a thirty percent (30%) collection fee, calculated on the gross undiscounted charges, will be applied to each delinquent invoice.

2

transportation services. After Estes applied Tariff 105-D, it declared forfeiture of the discounts and informed Bear that it owed undiscounted transportation charges in the amount of $17,104.04. Estes also informed Bear that it owed $5,131.21 in collection fees. Bear admits utilizing Estes' shipping services from September of 1999 until March of 2000 and that it has not paid for these services.

On April 6, 2001, Estes filed a counterclaim for its unpaid freight charges. On April 13, 2001, Bear filed an answer to this counterclaim asserting the affirmative defenses of set-off and breach of contract.

### Further Factual Details

1. The delivery receipt signed by Bear's agent acknowledges receipt of 6 crates and 2 rolls of carpet. The receipt notes the following:

> "3 crates on side"
> "3 upright"
> "1 crate severe [damage]"
> "3 crates hinges have been stretched out of whack"
> "2 missing support and legs [unintelligible, perhaps 'messed up']"

Thus, the delivery receipt reflects some possibility of damage and, perhaps, pilferage.

2. On February 9, 1999, an agent of Estes went to Jacksonville to "inspect" the shipment. This agent was primarily a sales person and not a claims person. She only did the "inspection" because she was scheduled to be in the area. The court cannot find by a preponderance of the evidence that this woman made representations to Bear that it would be 100% taken care of. The court does not find that she or any other authorized Estes agent made such representations, certainly not in any specific way.

The February 9 inspection report includes the following:

> "Loss or Damage <u>Both</u>"

3

"Date unpacked 2-9-99"
"What evidence was there of pilferage before delivery <u>Busted Crates</u>"
"Was there sufficient space in package to contain missing goods? <u>Yes</u>."
"Do you consider adequately packed or protected? <u>Yes</u>"

Describing photos:

"1 lock busted"
"Lock broken off - knives on floor."
"Light fixture broken"
"Transparencies broken and torn."
"Light fixture busted out of cabinet."
"Show case plexiglass scratched"
"Damage to crate"
"Damage to crate"
"Black rolls containing knives. Customer states that there were 6 rolls. As unpacked crates revealed 1."
"5 rolls of knives missing."

3. There is no evidence that there was any damage to any crates when they were received by Estes in Atlanta.

4. On October 1, 1999, after Bear had almost eight months to consider and reflect upon its purported damage and losses, it filed a claim for $11,063.16. There has been no evidence by Estes to rebut these claimed amounts. Bear has attempted to increase the amount of this claim. The court cannot find from a preponderance of the evidence that any increase is due. The court will allow Bear's base claim of $11,063.16. The court concludes that this claim should not have been disallowed by Estes.

5. On March 27, 2000, Estes wrote Bear a letter which states as to the September 1999 - March 2000 freight charges owed by Bear, "Please be advised if no payment is received within fifteen (15) days of the date of this letter, your discount will be forfeited and your account will be turned over to our legal department for further collection efforts." Bear responded by sending an unsigned check, dated April 19, 2000, for $7,315.72.

**ARGUMENTS**

Estes makes three primary arguments. First, Estes argues that it is entitled to judgment against Bear for the unpaid balance of tariff charges due. Second, Estes claims that discount forfeitures are valid and enforceable. Third, Estes contends that it is entitled to prejudgment interest.

Estes argues that it is entitled to collect $22,235.25, plus interest, for interstate tariff transportation charges that accrued pursuant to Tariff 105-D, Item 720. According to Estes, Tariff 105-D is incorporated by reference in the bills of lading for the interstate services provided to Bear. Estes claims that the bills of lading affix the carrier's duties to transport goods in interstate commerce and the shipper and/or consignor's obligation to pay the carrier's freight bills. *See Tex. Pac. R.R. Co. v. Leatherwood*, 250 U.S. 470, 481 (1919). It argues that Bear's obligation to pay as the named consignor and/or consignee on the bills of lading is clear. *See Louisville & Nashville R.R. Co. v. Rice*, 247 U.S. 201, 202 (1918) ("The Interstate Commerce Act requires carrier to collect and consignee to pay all lawful charges duly prescribed by the tariff in respect of every shipment.").

Estes contends that although the Trucking Industry Regulatory Reform Act of 1994 eliminated the requirement of filing tariffs, it still permits carriers to rely on tariffs, as long as notice was provided to the shipper.[4] Estes states that Congress requires that shipper to specifically request a written or electronic copy of the rate, classification, rules and practices of

---

[4] Estes cites the court to various opinions from the United States Courts of Appeal to demonstrate that they consistently enforce tariff rates and charges. *See Accura Sys., Inc. v. Watkins Motor Lines, Inc.*, 98 F.3d 874 (5th Cir. 1996); *Inman Freight Sys. Inc. v. Olin Corp.*, 807 F.2d 117 (8th Cir. 1986); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 778 F.2d 1365, 1372 (9th Cir. 1985).

the carrier. *See* 49 U.S.C. § 14706(c)(1)(B) (1994).[5] Estes notes that Bear did not request "a written copy of the rate, classification, rules and practices, upon which any rate applicable to its shipment . . . is based."

Next, Estes argues that discount forfeitures tariffs are valid and enforceable. Relying on *Accura Systems, Inc. v. Watkins Motor Lines, Inc.*, 98 F.3d 874 (5th Cir. 1996), Estes contends that loss of discount charges that accrue under the terms of a tariff are enforceable. Estes notes that the *Accura* court held that "these additional charges (loss of discount charges) accrued under the terms of the tariff when Accura failed to pay the freight charges due Watkins during the tariff 'discount period.' Accura withheld payment, and thereby lost the discount, on the basis of its damage claim against Watkins." Estes argues that there is no difference in the situation before the *Accura* court and the one here. It contends that it is seeking to enforce its loss of discount provision in Tariff 105-D, Item 720. Since Bear does not dispute that it has withheld payment of the freight charges, Estes asserts that it appropriately lost its discount and is obligated to pay Estes the undiscounted freight and collection charges.[6]

Finally, Estes argues that it is entitled to prejudgment interest on the undiscounted charges. *See United Van Lines, Inc. v. Homburger*, 932 F. Supp. 139 (W.D.N.C. 1996). Relying on *Coliseum Cartage Co., Inc. v. Rubbermaid Statesville, Inc.*, 975 F.2d 1022, 1026 (4th Cir. 1992), Estes states that "[t]o allow the [carrier] to recover without awarding prejudgment interest

---

[5] 49 U.S.C. § 14706(c)(1)(B) provides in relevant part:

If the motor carrier does not file a tariff with the Board, it shall provide under section 13710(a) to the shipper, upon request, the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to, is based.

[6] Estes claims that the United States Supreme Court has consistently held that a carrier subject to the Interstate Commerce Act must collect, and shippers, like Bear, must pay, all charges set forth in the applicable tariff. *See S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 343-44 (1982).

6

would be to diminish the tariff charge by an amount representing the value of the use of the money owed for the period prior to judgment." Since the published tariff was incorporated into the terms of the bills of lading and was in full force and effect when Bear's shipments were transported, Estes claims that it is entitled to prejudgment interest on the undiscounted tariff charges.

Bear argues that it is entitled to judgment because of Estes' fraud and because an accord and satisfaction occurred. According to Bear, Estes represented to Bear that it would not be charged shipping fees until Estes made Bear 100% whole for its loss. Since Estes has filed this counterclaim, Bear argues that Estes has committed fraud. Additionally, Bear claims that Estes promised not to charge shipping fees if Bear did not pursue a criminal investigation. Bear contends that this promise constitutes an accord and satisfaction. Thus, it claims that Bear's obligation to pay Estes has been satisfied because it did not contact law enforcement. *See Bank Indep. v. Byars*, 538 So. 2d 432 (Ala. 1988).[7] Bear also argues that Estes' rates and charges are ambiguous, excessive and unreasonable and that Estes breached its contract with Bear.

Estes replies that Bear's argument based on the defenses of fraud and accord and satisfaction are without merit. As for the argument based on the alleged fraud, Estes notes that it is based upon uncorroborated and unproven hearsay. Additionally, Estes explains that Item 163 of the tariff provides that:

> The Rules, and Charges provided in connection with such rules, published in this tariff will NOT apply: . . . to the extent conflicting provisions have been established either by written agreement or contractual arrangement with specific accounts.

Thus, Estes claims that unless Bear is able to produce evidence of a written agreement or other

---

[7] The court finds no evidentiary basis for fraud or accord and satisfaction.

type of contractual arrangement allowing it to receive "free" transportation services, its argument is meritless and it is bound by the tariff.

Addressing the affirmative defense of accord and satisfaction, Estes explains that it is inapplicable because Bear did not assert it in its answer to Estes' counterclaim. Estes also states that Bear's argument that the tariff is ambiguous and excessive is groundless. Estes notes that Bear cites no authority for this proposition. Further, Estes explains that 49 CFR § 377.203(f) specifically authorizes the practice of allowing discounts for early freight bill payments and forfeiture of those discounts in the event of late or nonpayment. *See also Accura Sys.*, 98 F.3d at 880-81.

## CONCLUSIONS OF LAW

A bill of lading is the contractual agreement between a shipper and a carrier. *See Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 783 n.2 (11th Cir. 1999). Under the former Interstate Commerce Act, freight charges incurred pursuant to a filed tariff were afforded "a legally superior status: that of a law." *In re Penn Cent. Transp. Co.*, 477 F.3d 841, 844 (3d Cir. 1973). Due to this legally superior status, the only defenses that could be raised against a carrier's suit for these legal services were that "the services have been paid for, the services were not rendered, that the services were charged under an inapplicable tariff schedule, or that the rates were unreasonable." *Id.* In the Trucking Industry Regulatory Reform Act of 1994, Congress eliminated the requirement of filing tariffs. However, Congress still allows carriers to rely on its tariffs as long as notice is provided to the shipper at its request. *See* 49 U.S.C. § 14706(c)(1)(B) (1994).

Estes may rely on its tariff. Estes Tariff EXLA 105-D, Item 720, is incorporated by reference in its bill of lading. The bill of lading is the contract that binds the shipper and carrier.

8

It is undisputed that Bear continued to utilize Estes' services after the February 1999 incident. The bill of lading executed by the parties for each shipment forms a separate contract. The fact that Bear disputes the bill for the February 1999 shipment does not invalidate its contractual obligation to pay for the shipments that subsequently occurred between September of 1999 and March of 2000.

As for the shipments that occurred between these dates, Bear does not contend that the services have been paid for, that the services were not rendered, or that the services were charged under an inapplicable tariff schedule. *See In re Penn Cent. Transp. Co.*, 477 F.2d at 844. The plaintiff does make a conclusory allegation that the shipping rates charged were excessive and unreasonable. However, the plaintiff does not state why the rates are excessive and unreasonable. Nor does the plaintiff cite the court to evidence in the record that would demonstrate the excessive nature of Estes' rates. To the contrary, Estes has submitted a list of the freight bills and the amounts due. The total balance at the discounted rate was $7,120.56. After invoking Tariff Item 720, the amount owed for undiscounted services is $17,104.04.

Bear attempts to raise fraud and accord and satisfaction as defenses. Even if these defenses were applicable to the subsequent shipments, they would procedurally be barred. Fraud and accord and satisfaction are affirmative defenses. As such, they must be set forth affirmatively in the pleading to the preceding pleading. *See Fed. R. Civ. P.* 8(c). Bear did not raise these affirmative defenses in its answer to Estes' counterclaim. Consequently, it is procedurally barred from now raising these affirmative defenses.[8]

The last issue that must be addressed is Estes' request for prejudgment interest.

---

[8] Again, the court finds no evidentiary basis for these assertions.

Typically, an award for prejudgment interest lies within the discretion of the trial court. *See Occidental Life Ins. Co. v. Pat Ryan & Assoc.*, 496 F.2d 1255, 1268 (4th Cir. 1974). However, this general rule "does not apply to actions brought to recover [charges] for shipment of freight subject to the Interstate Commerce Act." *Coliseum Cartage Co., Inc. v. Rubbermaid Statesville, Inc.*, 975 F.2d 1022, 1026 (4th Cir. 1992). The old Fifth Circuit has held that award of prejudgment interest for charges on freight shipments is mandatory. In *Louisiana & Arkansas Railway Co. v. Export Drum Co.*, 359 F.2d 311, 317 (5th Cir. 1966), the court made this clear: "Whether or not the Commission in its discretion might be able to refuse to award such interest, we hold that in actions initiated in the federal district courts for undercharges on freight shipments, interest from the time the money is due (the date of shipment) is a mandatory element of the damages." The Fourth Circuit also held in *Coliseum Cartage* that the congressional policy behind the Interstate Commerce Act required an award of prejudgment interest: "To allow the [carrier] to recover without awarding prejudgment interest would be to diminish the tariff charge by an amount representing the value of the use of the money owed for the period prior to judgment." *Id.* The court is bound by the Fifth Circuit's holding in *Louisiana & Arkansas Railway*[9] and finds the Fourth Circuit's holding in *Coliseum Cartage* persuasive.

## ULTIMATE FINDINGS OF FACTS AND CONCLUSIONS OF LAW

The court ultimately finds and concludes as follows:

1. Bear is entitled to recover $11,063.16 with interest from October 10, 1999.

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit, including Unit A, handed down on or before September 30, 1981.

In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

2. Estes is entitled to recover the amounts totaling $7,120.56 with interest from the respective dates due of each bill going to make up said total.

3. Estes is entitled to recover the additional amount of $9,983.48 forfeited discount with interest due thereon from April 15, 2000.

The interest rates for Bear and Estes will be calculated from the same scales.

In view of the failure of Estes to pay the loss claim, no attorney fees will be awarded.

Each party is to bear own costs.

Within fifteen days the attorney for Estes is to submit and serve a proposed final judgment consistent with the foregoing. The proposed judgment will set out all methods of calculation. The net judgment to Estes will be the amount owed to it less the amount owed to Bear.

Bear will have seven days to object as to form and/or method of calculation.

This ___19th___ day of February 2002.

_____
ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE